(115 N. W. 81.)

---

STATE OF NORTH DAKOTA v. JOHN S. MURPHY.

Opinion filed Feb. 20th, 1908.

**Criminal Law — Forgery — Proof of Similar Offense.**

1. On a prosecution for the crime of uttering a forged instrument knowingly, with intent to defraud, proof of similar offenses of forgery is admissable only as bearing on the intent with which the act for which the accused is informed against was done.

**Same — Intent — Admission of Signature.**

2. Proof of similar offenses in such cases is admissible only as having a bearing on the intent, although the accused admits at the opening of the trial that he signed the name of the person to the instrument, whose name is claimed to have been forged, and knew when he uttered the instrument that he had signed the name of such person to such instrument.

**Same.**

3. Proof of similar offenses in such cases as bearing on the intent alone is admissible, although the jury would be justified in finding a fraudulent intent without such proof, if they found that the accused was not authorized to sign the name of the person whose name is claimed to have been forged.

**Same — Hearing Evidence — Res Gestae.**

4. Declarations of a party to a contract, as to the terms of the contract, are not admissible as evidence as a part of the res gestæ when made after the contract is completed, and not in the presence of the parties, although made very soon after the parties separated.

**Same.**

5. Such declarations in this case considered, and *held* not within the exception to the rule against hearsay evidence that such declara-

tions are admissible as spontaneous expressions made in reference to the contract.

### Jury — Entry of Jury Room by Trial Judge — Act Prejudicial.

6. Entering the jury room by the trial judge in the absence of the attorneys, at the request of the jurors, after they have retired to deliberate on their verdict, and having any communication. or conversation with the jury in reference to the case, requires the granting of a new trial, without consideration of the question whether such conversation was prejudicial or not.

Appeal from District Court, Cass county; *Pollock, J.*

John S. Murphy was convicted of forgery, and appeals.

Reversed.

*Barnett & Richardson, John F. Callahan* and *W. S. Lauder,* for appellant.

Proof of one crime has no tendency to prove another unless they are so connected or related, that proof of one has a direct bearing upon another. Coleman v. People, 55 N. Y. 81; People v. Chea, 41 N. E. 505; Shaffner v. Com., 72 Penn. St. 60; Com. v. Jackson, 132 Mass. 16; People v. Molineaux, 61 N. E. 286; 1 Bishop's New Crim. Proc., section 1120.

If the intent is fairly deduced from the act itself, proof of other offenses is not admissible. People v. Molineaux, supra; People v. Lonsdale, 81 N. W. 277; People v. Dolan, 78 N. E. 569; State v. Vance, 94 N. W. 204; Bink v. State, 89 S. W. 1075.

Before proof of other offenses is admissible there must be dispute as to the identity of the appellant, the system, or as to his intent. Davenport v. State, 89 S. W. 1077; Bink v. State, supra; Coleman v. People, supra; People v. Corwin, 56 N. Y. 365; People v. Peck, 103 N. W. 178.

Declarations admissible as res gestae must be uttered contemporaneously with, and grow out of the act, and so connected with it, as to form one transaction. Wharton's Criminal Evidence, section 262 (8th Ed.) ; Underhill on Criminal Evidence, section 93; 1 Greenleaf on Evidence (16th Ed.) 192; 1 Rice on Evidence, section 212; Gillett on Indirect and Collateral Evidence, 290; 2 Am. & Eng. Enc. Law, 523; Lund v. Inhabitants of Tynsborough, 9 Cush. 36; People v. Lane, 34 Pac. 856; People v. Tucker, 38 Pac. 195;

—4 —

Cole v. State, 53 S. E. 958; Warwick v. State, 53 S. E. 1027; Johnson v. State, 108 N. W. 55; State v. Mickler, 64 Atl. 148; Stevison v. State, 89 S. W. 1072; Tillson v. Terwilliger, 56 N. Y. 273; 2 Jones on Evidence, section 347.

The visit of a trial judge to the jury room after the case is submitted is fatal to the verdict. State v. Wroth, 47 Pac. 106; 1 Spelling on New Trial and Appellate Practice, 75; Danes v. Pierson, 33 N. E .976.

Judge can only communicate with jurors in open court, in presence of counsel upon both sides. Read v. Cambridge, 124 Mass. 567; Crabtree v. Hagenbaugh, 23 Ill. 289; Fisher v. People, 23 Ill. 218; Bank v. Mix, 51 N. Y. 558; Snyder v. Wilson, 32 N. W. 642; O'Brien v. Insurance Co., 38 N. Y. S. 483; Gibbons v. Van Alstyne, 29 N. Y. St. Rep. 463; Plunket v. Appleton, 51 How. Pr. 469; State v. Alexander, 66 Mass. 148; Fish v. Smith, 12 Ind. 563; Valentine v. Kelley, 54 Hun. 79; Havenor v. State, 104 N. W. 116; Hearst v. Webster Mfg. Co., 107 N. W. 666; Sommer v. Huber, 183 Pa. St. 162; Hopkins v. Bishop, 51 N. W. 902; Quinn v. State, 30 N. E. 300; High v. Chick, 81 Hun. 100; Blashfield Inst. to Juries, Vol. 1, section 179; Moody v. Pomeroy, 4 Denio 115; Seely v. Bisgrove, 83 Hun. 293.

*T. F. McCue,* Attorney General, *R. N. Stevens,* Assistant Attorney General, *Geo. A. McGee,* State's Attorney of Ward county, and *B. D. Townsend,* for respondent.

In prosecution for forgery guilty knowledge must be shown. Montgomery v. State, 12 Tex. App. 325; Clark v. Commonwealth, Ky. L. Rep. 1029, 63 S. W. 740; Krum v. State, 148 Ind. 401; Higgins v. States, 157 Ind. 573; 3 Greenleaf on Evidence, page 111.

If the act of the trial judge in entering the jury room, and communicating with the juror was without prejudice, it was not error. Kerr v. Hammer, 15 N. Y. Supp. 605; Helmbrecht v. Helmbrecht, 31 Minn. 505; Hart v. Lindley, 50 Mich. 20; Oswold v. Railway Co., 29 Minn. 5; Priest v. State, 34 S. W. 611; People v. Kelley, 94 N. Y. 526; Allen v. Aldrick, 29 N. H. 63; Goldsmith v. Solomens, 2 Strob. 296; People v. Carnal, 1 Park. Cr. Rep. 256.

Where the evidence shows defendant's guilt, the showing of error must indicate that if a new trial were granted, a like conviction could not be had. Leyson v. Davis, 34 L. R. A. 453; People v.

Fernandez, 35 N. Y. 49; State v. Nelson, 91 Minn. 143; State v. LaGrande, 99 Iowa, 10; State v. DeBord, 88 Iowa, 103; State v. Thompson, 95 Iowa, 464; Rev. Codes N. D., 1905, section 10157.

MORGAN, C. J. The defendant was convicted of the crime of forgery in the third degree, and sentenced to imprisonment in the penitentiary for the period of one year and six months. The offense is charged in the information to have consisted in fraudulently and feloniously uttering a certain road overseer's receipt, knowing that the same was a forgery, which said receipt is in the following words and figures: "Road Overseer's Receipt, North Dakota. $231.30. Minot, Sept. 8, 1904. Received of the Great Northern Railway Company, two hnudred thirty-one 30-100 dollars, in full payment of road taxes levied against its property for year 1904 in Road District No. 1 and 2, township of Ross, county of Ward, North Dakota. Paid in labor upon the public highways of said road district by ———— days work by man and team, and ———— days work by man. Wm. Crowden, Overseer of Highways in Road District No. 1 and 2, Ross Township, Ward County, North Dakota." In the information it is further alleged that in the year 1904 the Great Northern Railway Company was indebted to Ross township in Ward county, N. D., in the sum of $231.30 for road taxes assessed against its property in said township for that year; that one Wm. Crowden was the road overseer of said township, and was authorized to collect taxes from said company and to receipt for the same, and that the defendant was authorized by said Great Northern Railway Company to pay said road taxes by doing work upon the highways of said township pursuant to a contract between him and said railway company, under the terms of which the said company agreed to pay said defendant the amount of said taxes upon presentation to said company of the road overseer's receipt for the full amount of said taxes. Upon this appeal there are many assignments of error, as the trial was a protracted one. The appellant, however, has argued only five assignments of error, and we will only dispose of those that have been argued in the brief. Upon the trial the defendant admitted that the name of Wm. Crowden, or Wm. Crowder, as it is sometimes spoken of in the evidence, was not signed to said receipt by said Crowden or Crowder, but that the same was signed thereto by the defendant himself or by his office clerk under his instructions. On the trial the state, under objection, was permitted to show that num-

erous other receipts of a similar nature to the one set forth in the information had been uttered by the defendant. These receipts were for taxes in different road districts and for different amounts, and some of them purported to have been receipts for road taxes from the Great Northern Railway Company, and some of them purported to be receipts for road taxes from the Soo Railway Company. The introduction of these other receipts is strenuously claimed to have been erroneous and prejudicial; and the question presented on that assignment is one of the main questions argued on the appeal.

The contention of the state is that such evidence was proper as bearing upon the intent with which the defendant uttered the receipt in question. The statute which it is claimed was violated in this case provides that the uttering of the forged instrument or receipt must have been done with intent to defraud. It therefore follows that, if Crowder authorized the defendant to sign his name to said receipt upon receipt of the money, no offense would be committed in uttering it by presenting it to the railway company in order that he might be reimbursed, as provided for by his contract with the railway company. As has been seen, this contract provided that the defendant was to be paid by the company a certain proportion of the amount assessed against it in any township upon presenting and turning over to it a valid receipt from the proper township officer that the road taxes assessed against said railway company had been fully paid by work upon the highways of said township in compliance with the statute permitting such taxes to be liquidated in such manner. The contention of the state is that the Crowder receipt was forged and presented to the railway company, and the money drawn thereon with intent to defraud the company. The defendant's contention is, as stated before, that Crowder authorized him to sign the receipt, and that he drew the money thereon in good faith, and without any fraudulent intent whatever. The trial court admitted evidence that the defendant had drawn money from the Great Northern Railway Company upon presentation of receipts purporting to have been signed by the road overseers of other townships in Ward county. These other receipts were in like terms with the receipt described in the information, excepting as to the date, the name of the township, the amounts, and the names of the persons purporting to have signed the same as road overseers, and some of the receipts were

for the taxes assessed against the Soo Railway Company. The contention of the state as to some of the receipts not described in the information is that they were signed by the road overseers, but the amounts were changed and raised after they were signed. From these facts, it is manifest that the question of the defendant's intent in uttering the receipt set forth in the information became an important one at the trial. As the signing of Crowder's name to the receipt and the uttering of it knowing that it had not been signed by Crowder, but by the defendant himself, were admitted by the defendant at the trial, the question whether Crowder had authorized the defendant to sign his name to the receipt and the defendant's intent were the only questions that were in issue before the jury.

By admitting the signing and uttering of the receipt, the defendant did not, of course, admit as a fact that the uttering of the receipt was with a fraudulent intent. Whether this was done fraudulently or in good faith was not and is not ordinarily in such cases capable of proof by direct evidence, nor would it necessarily follow that the defendant uttered the receipt fraudulently, although the jury may have been justified by the evidence in finding that the defendant was not authorized as a matter of fact to sign Crowder's name to the receipt. The legal inference that a person is presumed to intend the natural consequences of his acts, which is sometimes conclusive, is not necessarily of itself of much force in cases of uttering forged paper. For this reason it is generally held that proof of similar acts of forgeries, or of uttering of forged paper, is admissible as bearing alone on the question of the intent with which the forgery or uttering of forged paper for which the defendant has been informed against was forged or uttered. Such collateral proof must be limited within such a period that it may naturally be seen to throw light as to the intent with which the act under investigation was committed. The question of time during which other acts may be proven seems to be largely within the trial court's discretion. Such collateral proof is never admitted as proof of the commission of the criminal act for which the defendant is on trial. Such evidence of collateral facts is irrelevant and inadmissible as proof of the commission of the crime in question, on the theory that the person on trial is a hardened criminal and has committed other crimes. The law takes cognizance of the fact that criminals may not be guilty of all the crimes with which they may

be charged, and excludes proof that the commission of one crime is proof of the commission of another crime. For the single purpose of showing what a person's intent was in uttering a forged paper, proof of a similar act is, however, admissible, although the proof may show the commission of a distinct offense. This is a general principle well fortified by text-writers and precedents.

In Stephen's Digest of Evidence, art. 11, the rule is laid down as follows: "When there is a question whether a person said or did something, the fact that he said or did something of the same sort on a different occasion may be proved, if it shows the existence on the occasion in question of any intention, knowledge, good or bad faith, malice, or other state of mind, or of any state of body or bodily feeling, the existence of which is in issue, or is deemed to be relevant to the issue." Wharton's Criminal Law (6th Ed.) section 649, says: "Where the scienter or quo animo is requisite to, and constitutes a necessary and essential part of, the crime for which the person is charged, and proof of such guilty knowledge or malicious intent is indispensable to establish his guilt in regard to the transaction in question, testimony of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent is competent, notwithstanding they may constitute in law a distict crime." In 7 Am. & Eng. Enc. Law ,p. 62, it is said: "When there is a question whether the act was accidental or intentional, the fact that such act formed part of a series of similar occurrences in each of which the person doing the act was concerned is deemed to be relevant." In 3 Greenleaf on Evidence, section 15, it is said: "In the proof of intention, it is not always necessary that the evidence should apply directly to the particular act with the commission of which the party is charged, for the unlawful intent in the particular act may well be inferred from a similar intent proved to have existed in other transactions done before or after that time." In People v. Everhardt, 104 N. Y. 595, 11 N. E. 64, it was said: "Upon the trial the people were allowed to prove against the objection of the defendant the uttering of other forged checks by him upon other occasions. In this there was no error. The defendant by his plea of not guilty had put in issue everything which it was incumbent upon the people to prove. They had no direct or positive evidence that he personally forged the check which he uttered, and it was open for him to show that at the time he uttered it he had no knowledge that it

was forged, and was therefore innocent of crime; and for the purpose of showing the prisoner's guilty knowledge in such cases it has always been held competent to prove other forgeries. Mayer v. People, 80 N. Y. 364; People v. Shulman, 80 N. Y. 373, note. Such proof is not received for the purpose of showing other crimes than that charged in the indictment; but for the purpose of showing the guilty knowledge and intent which are elements of the crime charged, and it can be considered by the jury only for that purpose. Although the evidence of Gaylord, corroborated as it was, as to the guilty knowledge of the defendant, was quite clear and convincing, yet the people were not bound to rest upon a prima facie case, but had the right to confirm that evidence by the proof as to the uttering of other forged checks." The counsel for the appellant do not attempt to controvert these general principles. Their contention is that the facts of this case bring it within the principle announced in other cases by reason of the fact that the defendant admitted the making and uttering of the receipt. The cases chiefly relied on are State v. Bokien, 14 Wash. 403, 44 Pac. 889; People v. Lonsdale, 122 Mich. 388, 81 N. W. 277; State v. Vance, 119 Iowa, 685, 94 N. W. 204; Bink v. State (Tex. Cr. App.) 89 S. W. 1075. Some of these cases do hold that, where the facts of themselves show with certainty what the intent was, proof of other offenses is inadmissible; but we do not think that they are parallel on the facts with this case. In this case the question of defendant's intent was made an issue by his plea, and he consistently maintained throughout the trial that he acted in good faith, under such circumstances, his intent was in issue and the rightful subject of proof. We do not understand why evidence of other offenses was rendered irrelevant by reason of the fact that the defendant claimed authority for doing what he did, or by reason of the fact that he admitted signing the receipt and uttering it and receiving the money on it. A material ingredient of the crime, the intent, still remained an issue.

The intent to defraud may not have been proven beyond a reasonable doubt in the minds of the jury, although they may have been satisfied that the proof showed beyond such doubt that Crowder did not authorize the defendant to sign his name to such receipt. It might well appear that the defendant believed that he had such authority, although he had none as a matter of fact. A mistake or misunderstanding may and often does occur that

renders an act without fraudulent intent, although without author-
ity.  Under such circumstances, the legal presumption of fraudu-
lent intent that would follow the act would be of no force.  The in-
tent to defraud is a fact that must be proven in such cases, and
the prosecution may show such intent by facts and circumstances
and are not prohibited from showing it by proof of other offenses
of similar character, although the effect of such proof be to show
the commission of other crimes, although the facts be admitted ex-
cept the fraudulent intent.  The following cases are fairly in point
on this question:  In People v. Weaver, 177 N. Y. 434, 69 N. E.
1094, it was held: "Where upon the trial of an indictment charging
the defendant with having forged an indorsement upon a promis-
sory note and with having uttered it so indorsed, with intent to de-
fraud, the defense is that, while she wrote the indorser's name up-
on the note without his express authority, she though from prior
transactions with him that she had the right to do so, and that
she had no guilty intent in signing his name.  A prior note pur-
porting to have been executed by the defendant as maker upon
which she wrote the name of the same indorser, which he testi-
fied had not been indorsed by him, and to which he never authorized
her to sign his name, is competent evidence to prove scienter."  The
mere fact that the name of the same person was forged in this case
does not differentiate it in principle from the case under consid-
eration.  In Higgins v. State, 157 Ind. 57, 60 N. E. 685, the court
said: "It is said that the language used was not equivocal, and the
jury had a right to infer therefrom the intent charged.  While
this may be true, it does not render other proof of such intent
or motive incompetent.  When a fact is to be proven, the laws re-
quire the best evidence attainable, but it does not put any limit upon
the amount of proof that may be adduced.  *  *  *  We do not
think that the admission of any competent evidence can be rendered
erroneous by statements or admissions of the accused made to the
court and jury during the trial."  In Trogdon v. Commonwealth,
31 Grat. (Va.) 862, the court said: "One of the counsel for the
accused  *  *  *  insisted that, when the accused obtains goods
by falsely representing himself a man of property, the jury must
infer the guilty intent; and therefore evidence of collateral
facts is unnecessary and irrelevant, and can only mislead the jury.
It may be conceded that when goods are obtained by false repre-
sentations of the kind mentioned, and this is the whole case, the

jury may justly infer the fraudulent intent. But it frequently happens in a large majority of cases there are numerous facts and circumstances, sometimes of minute and varied character, throwing light upon the conduct and motives of the accused. It is impossible for the court to foresee what may be developed in the progress of the trial. When evidence is offered of other transactions to show the guilty intent of the accused, is the court to say the intent is already conclusively proved, and the evidence is therefore irrelevant? * * * The opinion of this court in Walsh's Case, 16 Grat. 541, has a strong bearing upon this question. There the distinction is plainly drawn between guilty knowledge or intent as a presumption of law and guilty knowledge or intent as a presumption of fact—a mere inference to be drawn by the jury. In the latter case, while the jury may find the accused guilty upon a given state of facts, they are not bound to do so. They are to wiegh all of the circumstances, and draw from them such conclusion as they may think warranted by the evidence. In Commonwealth v. White, 145 Mass. 392, 14 N. E. 611, the court said: "And it might be thought that in a case like this, when the bills were forged, it would follow almost necessarily that the defendant knew them to be so, and so it might be thought that the evidence of his use of other false bills was unnecessary for the purpose for which it was admitted, while it tended to prejudice the defendant in the eyes of the jury. But the defendant's knowledge was not admitted. On the contrary, it is still argued that there was no sufficient evidence to warrant the verdict, and evidence of knowledge which otherwise would be admissible is not made inadmissible by the fact that there is other strong evidence of knowledge in the case." In Bell v. State, 57 Md. 108, the court said: "It is not often possible to prove by positive and direct evidence that a party who uttered a forged paper has a knowledge that it is false. When it has been proven that the party charged has done the act for which he is indicted, the question still remains whether he committed it with guilty knowledge or whether he acted under a mistake, and evidence which tends to prove that he was pursuing a course of similar acts raises a presumption that he was not acting under a mistake, but with guilty knowledge and intent, and is admissible for that purpose." State v. Myers, 82 Mo. 558, 52 Am. Rep. 389; Higgins v. State, 157 Ind. 57, 60 N. E. 685; Anson v. People, 148 Ill. 494, 35 N. E. 145; People v. Everhardt, 104 N. Y. 591, 11 N. E.

62. The evidence of similar offenses was therefore competent in this case as an aid in determining what defendant's intent was in uttering the Crowden receipt.

Although the other similar offenses were not connected with the offense with which the defendant was charged, still they were of a similar general character, and related to a general plan or system in procuring money through means of dealings between railway companies and township officials in reference to road taxes. They were therefore substantially similar offenses, although they concerned different persons. One McAllister was a witness in the case, and was one of the overseers of highways with whom the defendant had dealings as to working out the taxes assessed against the Great Northern Railway Company in one of the townships of Ward county, and gave one of the receipts which it is claimed was afterwards altered and the amount increased. The receipt was given and some money paid, and all the conversation in reference to the making of the contract took place between the defendant and said McAllister at the buggy in the highway in front of one Schorb's dwelling house, and from 50 to 100 feet from the house. The conversation was not had in the presence of any one besides the persons named. After the contract was made, the receipt signed and some money paid thereon, the defendant drove away, and McAllister returned to the house, and had a conversation with Mrs. Schorb, who was a witness in the case, and was asked the following question: "When he came in, did he make any statement as to what transaction had occurred outside with Major Murphy?" And the witness was allowed to state what McAllister said, and did so as follows: " 'We are in luck. We have $167 to spend in Surrey township on the roads.' Then, after we talked, he said he didn't have it all to spend now, but he had in part. I think he said 'in part.' About $55 he had in his hands. I think he pulled the money out of his pocket, and laid it on the table. I don't think he had the money in his hands when he came in from outside." The question was objected to as hearsay, and no part of the evidence of a competent transaction. On the trial there was a disagreement between McAllister and the defendant as to what transpired between them while the contract was entered into at the buggy in which the defendant was seated; and especially as to the sum of money then paid to McAllister by the defendant. The state contends that the testimony of the witness as to what

was said by McAllister was proper as part of the res gestae; but we think its admission cannot be upheld on that ground. The contract had been entered into and the parties had separated, and what was said of McAllister was simply a narration of what had taken place. To render declarations or evidence competent as part of the res gestae, they must be so closely related to the principal fact as to show that they are spoken under the influence of the principal fact, and not in narration of it. The principal fact and the narration of it should be a connected fact, and not two separate disconnected transactions. The conversation between the defendant and McAllister was so disconnected with McAllister's statements to Mrs. Schorb as to be separate and independent acts. No precise rule can be laid down as to the time elapsing since the principal event when declarations may be admissible in relation to it. Each case must be determined under its own facts and circumstances. In this case negotiations had terminated and were not of such character that McAllister's declarations can be said to have been made under the influence of them. What McAllister thereafter said in reference to the transaction with the defendant is not similar to declarations as to cause of injuries rendered admissible when stated immediately after the injury, on the theory that the declarations were made while the shock of the injury was still present in the mind, and that what is said is the natural and spontaneous result of the excitement produced by the main fact. If sufficient time intervenes between the act and declarations concerning it to afford an opportunity for reflection, the declarations are inadmissible. In this case there was nothing in the nature of the transaction to bring it within any exception to the rule excluding hearsay evidence; and it was so disconnected from the original transaction as to exclude it as evidence of the res gestae. Greenleaf, Ev., sections 108, 162; 2 Elliott on Ev., section 548; Gillett on Indirect Ev., p. 290; 1 Rice, Ev., p. 212; 11 A. & E. Enc. Law, p. 253; Lund v. Inhabitants of Tyngsborough, 9 Cush. (Mass.) 36.

After the jury had been deliberating on their verdict for about forty-eight hours, the trial judge was sent for by the jury, and he appeared pursuant to such request, and the following proceedings were had as stated by the trial judge in the settled statement of the case: "At some time between the hours of 8:30 and 9 o'clock on December 3, 1906, the said Honorable Chas. A. Pollock, on coming to the courtroom and his chambers and being informed that the jury or some of the jurors desired to communicate with him,

went to the room where said jury were deliberating and were confined, rapped on the floor, and, the door being immediately opened by some one from the inside and being opened from right to left, stepped inside of the door, leaving the jury room door ajar, and while standing in the open space addressed the jury as follows: "Good evening, gentlemen. I understand you want to see me. Have you agreed?' To which the foreman of the jury answered: 'No; I think we cannot agree.' Whereupon the Honorable Charles A. Pollock, after pausing for a second, replied: 'I will ask you to consider the matter further. Good night.' Whereupon the said Honorable Chas. A. Pollock closed the door to the said jury room and returned to his chambers. Thereafter, in a short time, the bailiff reported to the said Honorable Chas. A. Pollock that the jury had agreed. That the visit of the said Honorable Chas. A. Pollock to the said jury room and the conversation there had between himself and the juror, as aforesaid, was had in the absence of the defendant and his counsel, and was without the knowledge or consent of the defendant or his counsel, and that no person or persons were present at said conversation, except the Honorable Chas. A. Pollock and the members of the jury. And that no record was made at the time of what was said and done on the occasion of the said visit of the said judge to the said jury room. I will further state that my addressing the jury as 'Good evening,' or 'Good night,' was nothing more than a salutation, and anything I said to them was not stated in a dictatorial manner, or intended or calculated as a threat. I will add, further, that in doing what I did I simply followed the practice which has obtained in this district so long as I have known anything of the practice, covering a period of 26 years.  *  *  *  And in going to the jury room upon the occasion in question the only object the court had was to ascertain whether any one was sick and unable to further deliberate, and also to find out whether they had agreed, and in no manner by word, act or deed attempted to influence their deliberations."

As to the purity of the intentions of the judge in going into the jury room in this case, and there having the brief communication with the jury, no certificate or proof is necessary so far as this court is concerned, as it well knows that his uprightness and sincere desire to be absolutely just and fair in all cases are beyond question. That admitted fact, however, does not meet the ques-

tion before us, which is: Did he do that which was beyond his judicial functions in respect to the case? We are forced to the conclusion that he did. His presence in the jury room for any kind of communitcation with the jury is not contemplated by any provision of the statute. The opposite is the plain inference from the statute. All communication to the jury in open court is subject to exception by the parties, if deemed improper. If any communication is made to them in the jury room in the absence of the parties, no opportunity is afforded for objections and exceptions at the time. The open court is the place for communications to the jury in the presence of, or on notice to the attorneys. The jury room is for the jury alone, and no communications are allowed with them in the room except upon orders from the court through the officer in charge of them, who is permitted to ask them whether they have agreed upon a verdict. All communications to the jury in reference to the case should be made in open court, and all communications to them in the jury room avoided. In this way all distrust and fear that something improper is said or done will be without foundation, and every act be subject to exception and review. Any communication by word or writing not in open court affects the efficiency of jury trials as a means of accomplishing justice after giving all parties full opportunity of being heard at all stages of the trial. A strict compliance with this practice of having all proceedings in court in the present of counsel, or on notice to them, unless waived, is better than to countenance violations thereof unless prejudice is shown. The state urgently insists that no prejudice could have resulted from what was done or said in this case, but we shall not consider that question. However, the fact that the foreman said that he thought they could not agree when the judge first spoke to them, and that they did agree in five or ten minutes thereafter, would be a stubborn fact for consideration if we entered upon an inquiry as to the effect upon the jury of the words spoken to them and the visit to the room. We think that any communication in this way as to the case should be prohibited and held prejudicial. It is against the policy of the law to indulge in secret communications or conferences with the jury or with jurors in reference to the merits or law of the case. To determine in each case whether prejudice resulted would be difficult, if not impossible, and justice will be better subserved by avoiding such communications entirely. The authorities are

practically unanimous in condemning such communications, and in holding them prejudicial as a matter of law.

In State v. Wroth, 15 Wash. 621, 47 Pac. 106, the court said: "In the discharge of his official duties, the place for the judge is on the bench. As to him the law has closed the portals of the jury room, and he may not enter. The appellant was not obliged to follow the judge to the jury room in order to protect his legal rights, or to see that the jury was not influenced by the presence of the judge; and the state cannot be permitted to show what occurred between the judge and the jury at a place where the judge had no right to be, and in regard to which no official record could be made." In Hanover v. State, 125 Wis. 444, 104 N. W. 116, the court said: "These rights are clearly of an important nature, and effect the substance of a jury trial and the right of a party to be heard or to bring in review every transaction of the court's proceedings. For the attainment of the best administration of justice, the law requiring that all proceedings of courts be open and public, and in the presence of the parties or their representatives, must be strictly enforced; and, in case of any infringement of this policy, parties are not to be put to the burden of showing that it in fact injured them, even though it be manifest that no improper motives prompted the acts complained of." In Sargent v. Roberts, 1 Pick. (Mass.) 337, 11 Am. Dec. 185, the court said, speaking through Mr. Chief Justice Parker: "As it is impossible, we think, to complain of the substance of the communication, the only question is whether any communication at all is proper; and, if it was not, the party against whom the verdict was is entitled to a new trial. * * * No communication whatever ought to take place between the judge and the jury, after the cause has been submitted to them by the charge of the judge unless in open court. * * * The only sure way to prevent all jealousy and suspicion is to consider the judge as having no control whatever over the case except in open court in the presence of the parties and their counsel. The public interest requires that litigating parties should have nothing to complain of or suspect in the administration of justice, and the inconvenience of the jurors is of small consideration compared to this great object. * * * It is better that everybody should suffer inconvenience than that a practice should be continued which is capable of abuse, or at least of being the ground of uneasiness

and jealousy." See, also, Danes v. Pearson, 6 Ind. App. 465, 33 N. E. 976; Du Cate v. Town of Brighton (Wis.) 114 N. W. 103.

The other questions argued in the brief will not probably arise on another trial. Hence consideration of them is not material.

The judgment is reversed, a new trial granted, and the cause is remanded for further proceedings.

FISK, J., concurs.

SPALDING, J. (concurring specially). I concur in the reversal of the judgment in this case, but I think the evidence of other offenses, if admissible at all, should be admitted upon other grounds than that of showing intent.

1. The trial of this case occupied several weeks, and a large part of this time was spent in an attempt to prove and disprove the commission of other simlar offenses. The admission of proof of other offenses in a criminal trial, it seems to be, is, at best a dangerous proceeding, and courts should restrain it within very narrow limits. The defendant is placed on trial charged with the commission of a specific act, and to permit the state to introduce evidence of other acts which are claimed to be unlawful, of which the defendant has had no notice—no opportunity to prepare his defense on them—and of which he may be entirely innocent, and yet by reason of the surprise and lack of opportunity, be wholly unable to establish his innocence, may work great injustice. The danger of this is so great that proof of other offenses should not be admitted unless clearly within the well-established rules. Take this case as an illustration. The defendant was tried nearly 400 miles from his home, and from where the offenses were claimed to have been committed. He was informed against on only one offense, yet to all intents and purposes he was placed upon trial for four or five different offenses, and compelled to go this long distance after the trial commenced, to look for witnesses to disprove charges of which he had no prior notice. The rule seems to be that similar offenses in cases of this kind may be shown, first, to prove the intent; second, when they are part of one criminal scheme or system. There is no contention that the other offenses permitted to be shown had any connection with the crime for which the defendant was tried. But it is contended that the proof of the other forgeries was admissible for the purpose of showing the intent. I, however,

am unable to see that the question of intent properly entered into the proof in this case. The defendant expressly admitted at the commencement of the trial the signing of the name which he was charged with forging to the receipt. He claimed authority from Crowder to do so. Crowder denied having given him such authority. Throughout the entire case it was conceded that the purpose with which the receipt was executed and uttered was to secure the money which it represented from the railway company. There was no occasion to question this intent, and the defendant did secure the money represented by the receipt from the company. This narrowed the issue solely to the question as to whether he was authorized to sign Crowder's name, and the admission of evidence of the other offenses claimed to have been committed in no way shed any light upon that question, and the only effect its admission could have had must have been to prejudice the jury by making it appear to them that the defendant was a confirmed criminal. Again, after the attempted proof of each of the other unlawful acts of the defendant, how was the position of the state improved without proof of the intent with which they were committed? If proof of intent under the circumstances was necessary in the case at bar to have made the proof of similar acts competent, proof of intent should have been made in connection with them. If it was unnecessary to prove the intent in this case by reason of the conceded object to obtain money from the railway company, then proof of other acts was inadmissible. If proof of the intent in the present case was necessary, it was equally necessary in the other instances to constitute them any corroboration of the state's theory by showing intent. As I view the case the question of intent to defraud rested solely upon the question as to whether or not he was authorized to sign Crowder's name, and the only evidence competent was evidence directed to that point. I think this view of the law is sustained by a great number of cases. State v. Bokien, 14 Wash. 403, 44 Pac. 889; Commonwealth v. Jackson, 132 Mass. 16; Shaffner v. Commonwealth, 72 Pa. 60, 13 Am. Rep. 649; Coleman v. People, 55 N. Y. 81; People v. Shea, 147 N. Y. 78, 41 N. E. 505; People v. Molineux, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193; State v. Vance, 119 Iowa, 685, 94 N. W. 204; Bink v. State (Tex. Cr. App.) 89 S. W. 1075; State v. Sparks (Neb.) 113 N. W. 154. If the admission of this class of evidence does not constitute error, it is clear to me that it is because each offense constituted

part of a general system or scheme, or it might have been so construed.

2. The defense called one De Lance as a witness to prove that Crowder had stated that the receipt in question was worth or could be made worth $2,500 to him, or that he could make it cost the defendant that much, and he was asked whether or not he heard Crowder make such a statement. De Lance was a witness for the state, and appears to have been hostile to the defendant, and, after more or less evasion, he answered in substance that Crowder had made such a statement in his presence and hearing. This was the substance of his testimony. After so testifying, the special prosecutor was permitted, over objection made by defendant, to ask certain questions in cross-examination It is necessary to set out these questions and answers, and it appears to me that no discussion regarding their propriety is necessary. Under the guise of asking questions, the counsel made insinuations and charges against the defendant, if not improper in any case, certainly improper cross-examiation of this witness. These questions were duly objected to, and the overruling of the objections is assigned as error. "Q. Did he [Crowder] appear like a man who was acting like a jackal, going around and blackmailing a man behind his back, did he? I want to find out whether he was mad because some one was trying to commit a crime agaist him, or whether he was trying to commit a crime against somebody else? A. No he did not. I heard what he said, and saw the expression of his face and heard the tone of his voice. Q. Did you get any impression from hearing the way he said it, and the public manner in which he said it, and the tone of his voice, and the expression of his face, that he was contemplating himself committing a crime against Maj. Murphy; or that he was enraged because he found that some one had committed a crime against him? Which was the impression you got? A. Why, he seemed angered at Murphy and the others down there for having forged his name more than anything else. Q. In other words, it seemed that he felt outraged because a crime had been committed against him, rather than that he was planning a crime against some one else? A. It looked that way to me. Q. Was there anything about the expression of his face, or tone of his voice, your mind being refreshed on the subject, that indicated that he had any other feeing than that of a man who discovered his

—5—.

name had been forged, and didn't know it before, and he felt outraged, and was angry. Was there anything inconsistent, or anything in his face or manner or expression o'her than that, at the time he made that remark? A. Well, I never had any conversation with a man that had had his name forged before. He was mad—pretty mad, in fact. Q. You know about how a man would feel like Crowder, who had a little farm, who had had his name forged. You know about how he would express himself on the .subject when he came back after having asked the party to pay it up. Was there anything in his voice at that time other than a man would naturally expect under these circumstnces?" Objection being interposed that it would be impossible for the witness to tell, the court said: "What was his expression; how did he express himself? Q. And that he compelled those responsible for the forgery to pay up or dig up? And did you not also know by the same process of reasoning by which you arrived at that conclusion. Did you not also know that he would make them fellows dig up, he referred to the man who forged the receipt? A. Or was responsible for it. Q. Was the tone of his voice and the expression of his face during the entire conversation consistent with the statement that somebody had forged his name? A. Yes, sir; it was consistent. Q. Was it the expression you would naturally expect a man to have on finding and honestly believing his name had been forged, and after having compelled the party to settle? A. His face was consistent with a man who was very angry. Q. When he [Crowder] looked vindictive ,you mean by that that he appeared to be angry because his name actually had been forged, and the statement he uttered at that time was true? A. He had that appearance; yes." The object of this line of questions was undoubtedly to corroborate by showing Crowder's appearance and actions, his denial of authority to Murphy to sign the receipt. It may have been competent for the state to show whether Crowder appeared angry or pleased; but these questions go far beyond any proper examination of a witness to show the appearance of a party during a conversation. The witness was not asked to state the conversation which took place, but to give his impressions and his conclusions as put in his his mouth by counsel. The impropriety of this line of questions cannot be doubted, and as counsel for the defendant states in his brief—with which statement I concur—: "Authority upon the subject cannot be cited, for a parallel to this proceeding, we firmly

believe, cannot be found in all the judicial history of this country." Trial courts in this state are inclined to be over-lenient to counsel in permitting prejudicial questions of this character, and I deem it important to call attention to this phase of the case at bar to indicate that courts should restrain them within proper limits, and that the discretion vested in trial courts can be abused in the permission to make use of charges and innuendoes by question of the counsel.

(115 N. W. 84.)